1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   CHARA CURTIS, et al.,

11                         Plaintiffs,

12              v.

13   ILLUMINATION ARTS, INC., et al.,

14                         Defendants.

CASE NO. C12-0991JLR

ORDER GRANTING IN PART
AND DENYING IN PART
PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY
JUDGMENT

15                    **I.      INTRODUCTION**

16        Before the court is Plaintiffs Chara Curtis, Cynthia Aldrich, and Alfred Currier's

17   motion for partial summary judgment.  (Mot. (Dkt. # 22).)  The court has considered the

18   motion, all submissions filed in support and opposition thereto, the applicable law, and

19   the balance of the record.[1]  Being fully advised, the court GRANTS Plaintiffs' motion.

20   //

21   ─────────────────

22   [1] No party has asked for oral argument, and the court deems this motion appropriate for
disposition without it.

ORDER- 1

## II.     BACKGROUND

Plaintiffs wrote and illustrated three children's books that are the subject of this litigation: *Fun is a Feeling*, *All I See Is Part of Me*, and *How Far to Heaven?* (collectively, "the Books"). (Compl. (Dkt. # 1) ¶¶ 11-16; Answer (Dkt. # 13) ¶¶ 11-16.) Each of the Books is an original work that may be copyrighted under the laws of the United States. (Compl. ¶ 11; Answer ¶ 11.) The copyright office issued certificates of registration to Plaintiffs for each of the Books between 1991 and 1994. (Compl. ¶¶ 12-16; Answer ¶¶ 12-16.)

Defendant Illumination Arts, Inc. ("IAI") is a Washington corporation founded in 1987. (*See* Compl. ¶ 4; Answer ¶ 4; Kruckeberg Decl. (Dkt. # 24) Ex. A at 6 (". . . IAI has been an active publisher of books since its formation in 1987.").) Defendant Illumination Arts Publishing, LLC ("IAP") is a Washington limited liability company founded in 2011. (*See* Compl. ¶ 5; Answer ¶ 5; Resp. (Dkt. # 25) at 2 ("IAP was formed on February 18, 2011.").) Defendant John Thompson is both the president of IAI and the manager of IAP. ((Kruckeberg Decl. Ex. A at 6; Thompson Decl. (Dkt. # 26) ¶¶ 2-3.) He is the largest shareholder of IAI, the sole owner of IAP, and the sole operator of both IAI and IAP. (Thompson Decl. ¶ 12.) Defendant Kimmie Lynn Thompson (formerly Kim Hansen) is Vice President of Promotions for IAP. (Kruckeberg Decl. Ex. B at 10.)

Mr. Thompson has admitted that IAI "has gone through significant financial woes." (Thompson Decl. ¶ 4.) Mr. Thompson has testified: "I started [IAP] after my personal bankruptcy in 2010 in order to try to rebuild and rebrand our authors' work, while keeping the collection of Illumination Arts inspiring children's books alive." (*Id.*

ORDER- 2

1    ¶ 5.)  Under an "Agreement of Understanding" dated February 21, 2011, IAP assumed

2    operations of IAI and purported to take control of IAI's inventories, accounts receivable,

3    and book-sale proceeds.  (Kruckeberg Decl. Ex. A (Agreement of Understanding) at 6-7.)

4    Mr. Thompson signed the Agreement of Understanding on behalf of both IAI and IAP.

5    (*Id.* Ex. A at 8.)  Under the Agreement of Understanding, "[u]ntil a sale of IAI assets has

6    been completed," IAP is not to compensate Mr. and Ms. Thompson for their services

7    "except for the right to live in the fourth bedroom of the business office without paying

8    rent/utilities therefore [sic]."  (*Id.* Ex. A at 7; *see also* Thompson Decl. ¶ 6 ("[M]y new

9    wife and I live in the office without pay . . . .").)  There was never a rental agreement

10   executed between IAP and the Thompsons.  (Kruckeberg Decl. Ex. H (Defendants'

11   Responses to Plaintiffs' Discovery Requests) at 15-16.)  Mr. and Ms. Thompson provide

12   funds to pay for IAP expenses and obligations when IAI sales proceeds are insufficient.

13   (*Id.* Ex. A at 7; *see also* Thompson Decl. ¶ 6 ("I put the majority of my social security

14   check and outside income into keeping . . . [IAP] afloat."); *id.* ¶ 13 ("To cover the costs

15   of keeping both businesses viable, [Ms. Thompson] has loaned some of her personal

16   funds and I have invested my own money.").)  Nevertheless, the Agreement of

17   Understanding states that if IAI ever sells its assets, then the purchaser of those assets

18   will pay Mr. and Ms. Thompson for any amounts they have "loaned" to IAP less an

19   amount equal to the Thompsons' personal expenses which IAP has paid.  (Kruckeberg

20   Decl. Ex. A at 7-8.)

21           IAI has received loans from its shareholder, Mr. Thompson, amounting to

22   approximately $900,000.00.  (Thompson Decl. ¶ 13 (stating that Mr. Thompson has

"loaned to" or "'invested' nearly $900,000" in IAI); *see also* Kruckeberg Decl. Ex. A at 6 ("IAI has incurred debts totaling $1.7 million, of which less than $900,000 consists of loans from shareholders.").) IAI never issued any promissory notes memorializing any loans from Mr. Thompson. (*See* Krcukeberg Decl. Ex. H at 71.) Instead, "[t]he loan amount was calculated each year based on new advances by [Mr. Thompson] reduced by payments to [Mr. Thompson] . . . ." (*Id.*) IAI no longer has any bank or other investment accounts. (*Id.* at 74.)

Mr. Thompson stated in email correspondence with Mr. Curtis that he created IAP "in order to (hopefully) hold off Bank of America and TWP," two of IAI's creditors. (Curtis Decl. (Dkt. # 23) Ex. A at 6.) TWP America, Inc. was pursuing a claim against IAI in New York State at the time IAI's assets were transferred to IAP. (*See* Kruckeberg Decl. Ex. C (attaching a copy of a $50,370.36 judgment against IAI on behalf of TWP America).) Mr. Thompson stated that ultimately the transfer of assets from IAI to IAP was made for the purpose of avoiding a circumstance that "would result in no one but the secured creditors getting anything." (Curtis Decl. Ex. B at 9.) Mr. Thompson described his plan in detail in email correspondence to Mr. Curtis:

> As I told you a while back, [IAI] has one judgment with TWP [America, Inc.] and another in the works with B of A [Bank of America]. Together these total over $100K. To avoid a liquidation which would result in no one but the secured creditors getting anything, the inventories and operating assets, including the inventory, were transferred to another company last Feb [sic] in hopes we can secure a way to sell the company as an ongoing operation. As I noted, any sales agreement which is negotiated must specify that back royalties be paid even before secured creditors.

(*Id.*)  In his response to Plaintiffs' motion for partial summary judgment, Mr. Thompson has not disavowed any of the statements contained in the email correspondence described above.

Between 1989 and 1992, Plaintiffs entered into publishing contracts with IAI for each of the Books.  (Compl. ¶¶ 19-21; Answer ¶¶ 19-21.)  The publishing contracts are valid and enforceable (Compl. ¶ 65; Answer ¶ 65), and provide for the following:

- IAI must provide Plaintiffs with quarterly royalty reports showing (1) royalties due for the quarter, (2) cumulative royalties earned, and (3) the number of copies of each book printed and bound (Compl. ¶ 23; Answer ¶ 23);

- All quarterly reports are due within 90 days after the end of each quarter (Compl. ¶ 24; Answer ¶ 24);

- All royalties must be paid within 90 days after the end of each quarter (Compl. ¶ 25; Answer ¶ 25);

- On written notice, Plaintiffs have the right to inspect IAI's books and records to verify the quarterly and cumulative royalties due to them (Compl. ¶ 26; Answer ¶ 26);

- Plaintiffs may terminate the publishing contracts if, after 10-days written notice IAI fails to provide past-due statements of account and royalty payments (Compl. ¶ 28; Answer ¶ 28); and

- The publishing contracts do not license electronic reproduction or distribution rights to IAI (Compl. ¶ 27; Answer ¶ 27).

ORDER- 5

1    Plaintiffs received regular royalty payments through the quarter ending June 30,

2    2009.   (Curtis Decl. ¶ 4.)  Beginning with the quarter ending September 30, 2009, IAI

3    ceased sending Plaintiffs royalty statements and ceased paying Plaintiffs regular

4    royalties.  (Kruckeberg Decl. Ex. H at 84-89 (Defendants' Responses to Request for

5    Admission ("RFA") Nos. 1-24).)  Since that time, Defendants have made only one small,

6    unscheduled royalty payment to Plaintiffs.  (Curtis Decl. ¶ 4.)

7    After Defendants ceased sending royalty statements and paying royalties,

8    Plaintiffs demanded, via telephone and email, that Defendants resume paying royalties

9    and sending statements.  (Curtis Decl. ¶ 5.)  In a letter to Mr. Thompson, dated July 14,

10   2011, Mr. Curtis demanded all past-due royalties.  (*Id.* Ex. C.)  Defendants, however,

11   continued to fail to pay royalties or provide royalty statements.  (Kruckeberg Decl. Ex. H

12   at 32 (In Defendants' Responses to RFA Nos. 25-26 they admit that they failed to deliver

13   royalties and statements within 10 days of written demand).)  In a letter to Mr. Thompson

14   dated August 8, 2011, Mr. Curtis terminated the publishing contracts with Illumination

15   Arts, Inc. for *All I See Is Part of Me* and *Fun Is a Feeling* (Curtis Decl. Ex. D), and in a

16   letter dated September 15, 2011, Mr. Curtis terminated the publishing contract for *How*

17   *Far to Heaven?* (*id.* Ex. H).

18   After terminating the publishing contracts, Plaintiffs requested an audit of

19   Defendants' books and records, and Defendants denied the request.  (Kruckegerg Decl.

20   Ex. H at 90 (Defendants' responses to RFA Nos. 27-28).)  In addition, Plaintiffs

21   requested to purchase the Books remaining in Defendants' inventory within 180 days of

22

1   terminating the publishing contracts, but Defendants denied this request as well.  (*Id.*

2   (Defendants' responses to RFA Nos. 29-30).)

3         Before terminating the publishing contracts, Plaintiffs discovered that Defendants

4   had made electronic copies of the Books available on BigUniverse.com, despite the fact

5   that the publishing contracts do not license digital rights for the Books to Defendants.

6   (Curtis Decl. ¶ 12.)  In two separate letters to Mr. Thompson, Mr. Curtis demanded that

7   *All I See Is Part of Me* and *Fun Is a Feeling* be removed from BigUniverse.com.  (*See id.*,

8   Exs. C-D.)  Plaintiffs also discovered that full copies of the Books had been posted to

9   Google Books with the following notice:  "Pages displayed by permission of Illumination

10  Arts Pub. Co. Copyright."  (*Id.* Ex. I at 2.)  In a letter to Mr. Thompson, dated September

11  9, 2011, Mr. Curtis demanded that IAI remove the Books from any website.  (*Id.*)  Mr.

12  Curtis explicitly stated that IAI was infringing Defendants' copyrights by making the

13  Books available without permission.  (*Id.* ("[T]his violates my rights under 17 U.S.C.

14  Section 106.").)

15        After Plaintiffs terminated the publishing contracts, Defendants continued making

16  copies of, distributing, and displaying the Books online and at trade shows.  (Kruckeberg

17  Decl. Ex. H at 92-93 (Defendants' Responses to RFA Nos. 41-43); *Id.* Ex. J (showing

18  Illumination Arts website images as of April 2, 2012 showing the Books for sale); *id.* Ex.

19  K (Illumination Arts Facebook page dated June 18, 2012, showing Ms. Thompson

20  displaying and selling one or more of the Books at a trade show); *id.* Ex. L (Illumination

21  Arts Facebook images dated May 26, 2012, digitally displaying Plaintiffs' cover art for

22  the Books).)  Defendants also continued to sell the Books (*see id* Ex. M (excerpts of sales

1   reports for the Books showing sales after termination of publishing contracts)), despite

2   Plaintiffs' repeated requests to cease and desist (*see id.* Exs. J, K, L).  On June 8, 2012,

3   Plaintiffs filed the present lawsuit alleging willful infringement of their copyrights.  (*See*

4   *generally* Compl. (Dkt. # 1).)  Even after Plaintiff's filed their complaint, Defendants

5   continued to sell the Books.  (Kruckeberg Decl. Ex. M.)

6        Plaintiffs seek partial summary judgment on issues of (1) breach of contract, (2)

7   infringement, and (3) willfulness.  (Mot. at 9.)  Plaintiffs also seek an order permanently

8   enjoining Defendants from reproducing, distributing, or displaying the Books.  (*Id.*)

9                        **III.    ANALYSIS**

10   **A.  Standards**

11        Summary judgment is appropriate if the evidence, when viewed in the light most

12   favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

13   any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

14   P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Torres v. City of Madera*,

15   648 F.3d 1119, 1123 (9th Cir. 2011) ("Summary judgment is appropriate only if, taking

16   the evidence and all reasonable inferences drawn therefrom in the light most favorable to

17   the non-moving party, there are no genuine issues of material fact and the moving party is

18   entitled to judgment as a matter of law.").  The moving party bears the initial burden of

19   showing that there is no genuine issue of material fact and that he or she is entitled to

20   prevail as a matter of law.  *Celotex*, 477 U.S. at 323; *Furnace v. Sullivan*, 705 F.3d 1021,

21   1026 (9th Cir. 2013).  If the moving party meets his or her burden, then the non-moving

22   party "must make a showing sufficient to establish a genuine dispute of material fact

1    regarding the existence of the essential elements of his case that he must prove at trial" in

2    order to withstand summary judgment.  *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th

3    Cir. 2007).

4         In judging evidence at the summary judgment stage, the court does not make

5    credibility determinations or weigh conflicting evidence, but rather views all evidence

6    and draws all inferences in the light most favorable to the non-moving party.  *T.W. Elec.*

7    *Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing

8    *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *see also*

9    *Hrdlicka v. Reniff*, 631 F.3d 1044, 1048, 1051 (9th Cir. 2011); *Motley v. Parks*, 432 F.3d

10   1072, 1075 n. 1 (9th Cir. 2005) (en banc); *Miranda v. City of Cornelius*, 429 F.3d 858,

11   860 n. 1 (9th Cir. 2005).  However, conclusory testimony in affidavits and motion papers

12   is insufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill*

13   *Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Similarly, "[w]hen

14   opposing parties tell two different stories, one of which is blatantly contradicted by the

15   record, so that no reasonable jury could believe it, a court should not adopt that version of

16   the facts" when ruling on the motion.  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also*

17   *Hansen v. United States,* 7 F.3d 137, 138 (9th Cir. 1993) ("When the non-moving party

18   relies on its own affidavits to oppose summary judgment, it cannot rely on conclusory

19   allegations unsupported by factual data to create an issue of material fact.")  As the

20   Supreme Court has stated, "[the] mere existence of a scintilla of evidence . . . will be

21   insufficient; there must be evidence on which the jury could reasonably find for the [non-

22   moving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**B.  Breach of Contract**

In their responsive memorandum, "Defendants admit that IAI and IAP breached their obligations to pay the Plaintiffs' royalties." (Resp. (Dkt. # 25) at 3; Thompson Decl. ¶ 7 (IAI and IAP do not dispute that unpaid royalties exist to Plaintiffs.").) Accordingly, they acknowledge that "summary judgment is proper as no fact issues exist and Plaintiffs' are entitled to judgment as a matter of law." (*Id.*)  Based on this admission, the court GRANTS Plaintiffs' motion for summary judgment with respect to their claim for breach of contract against Defendants IAI and IAP.

**C.  Piercing the Corporate Veil**

Although Defendants have acknowledged that both IAI and IAP are liable for breach of contract, they assert that "IAI and IAP have different timeframes for liability." (Resp. at 3.)  Defendants assert that IAI is liable for Plaintiffs' breach of contract damages from the date of its formation to the present, and that IAP's liability is also limited from the date of its formation (February 18, 2011) to the present. (*Id.* at 3-4 ("IAI is, certainly liable from the date of formation to the present.  IAP's liability, however, should only be for royalties due between February 18, 2011 (its date of formation) and the present.").)  This would effectively limit Plaintiffs' recovery because all of IAI's assets were purportedly transferred to IAP in the Agreement of Understanding. (*See generally* Kruckeberg Decl. Ex. A.)  Plaintiffs assert that both IAI and IAP are fully liable for either's breach of contract because IAP is a mere continuation of IAI. (Mot. at 12.)  In addition, Plaintiffs assert that the court should disregard the corporate veil between IAI and IAP and between the companies and Mr. and Ms. Thompson based on a

ORDER- 10

1  fraudulent transfer of assets from IAI to IAP made for the purpose of escaping liability to

2  IAI's creditors.  (*Id.* at 13-15.)  The Thompsons oppose any piercing of the corporate veil

3  between the companies or with respect to either of them personally.  (Resp. at 3-6.)

4          Generally, a corporation purchasing the assets of another corporation does not

5  become liable for the debts and liabilities of the selling corporation.  *Cambridge*

6  *Townhomes, LLC v. Pac. Star Roofing Inc*., 209 P.3d 863, 868 (Wash. 2009).  Likewise,

7  individual shareholders or owners are not ordinarily liable for the actions or debts of the

8  corporation.  *Burns v. Norwesco Marine, Inc.*, 535 P.2d 860, 862-63 (Wash. Ct. App.

9  1975) ("The corporate form is of course frequently utilized to limit the personal liability

10 of its officers, directors and shareholders.  And as a general rule, the corporate entity will

11 be respected by the courts.").  Indeed, "[t]he purpose of a corporation is to limit liability."

12 *Meisel v. M & N Moders Hydraulic Press Co.*, 645 P.2d 689, 693 (Wash. 1982).  The

13 general rule, however, does not apply if:  "(1) there is an express or implied agreement

14 for the purchaser to assume liability; '(2) the purchase is a de facto merger or

15 consolidation; (3) the purchaser is a mere continuation of the seller; or (4) the transfer of

16 assets is for the fraudulent purpose of escaping liability.'"  *Cambridge Townhome*, 209

17 P.3d at 868 (quoting *Hall v. Armstrong Cork, Inc.*, 692 P.2d 787, 789-90 (Wash. 1984)).

18 The last two exceptions are potentially at issue here, and the court will consider each in

19 turn.

20          **1.   Mere Continuation**

21          Plaintiffs assert that IAP should be fully liable with respect to any breach of

22 contract by IAI because IAP is a mere continuation of IAI.  (Mot. at 12.)  To determine

ORDER- 11

1   whether a successor business is a mere continuation of the seller business, the court

2   considers two factors:  (1) whether there is a common identity between the officers,

3   directors, and stockholders of the selling and purchasing companies, and (2) the

4   sufficiency of the consideration running to the seller corporation in light of the assets

5   being sold.  *Cambridge Townhomes*, 209 P.3d at 868.  In considering these factors, "the

6   objective of the court is to discern whether the 'purchaser represents merely a new hat for

7   the seller.'"  *Id.* (internal quotation marks omitted) (quoting *Cashar v. Redford*, 624 P.2d

8   194, 196 (Wash. Ct. App. 1981)).

9        Under the standards set forth above, Plaintiffs have established on summary

10   judgment that IAP is merely a "new hat" for IAI.  First, the Agreement of Understanding

11   that transfers IAI's inventory and assets to IAP recites that Mr. Thompson is the

12   President, Chairman of the Board, and sole active shareholder of IAI, as well as the only

13   shareholder and the Manager of IAP.  (Kruckeberg Decl. Ex. A at 6.)  Further, Mr.

14   Thompson has admitted that he is "the sole owner of IAP, the largest shareholder of IAI,

15   and the sole operator of both IAP and IAI."  (Thompson Decl. ¶ 12.)  Thus, there is no

16   genuine issue of material fact that there is a common identity between the officers and

17   shareholders or members of the two companies.[2]

18        Despite the fact that the Agreement of Understanding recites that the sale of IAI

19   "would create a current fair market sales price of $300,000," there is nothing in the

20

21   _____

22        [2] The fact that the IAI is a corporation and IAP is a limited liability company with only one member does not alter the analysis of the first factor.  *See Cambridge Townhomes*, 209 P.3d at 868 ("The particular form of the business entity should not be determinative.").

ORDER- 12

1    Agreement of Understanding to indicate that IAP paid anything for the transfer of IAI's

2    assets.  (*See generally* Kruckeberg Decl. Ex. A.)  Defendants have produced no evidence

3    in contravention of the forgoing.  Indeed, the assertion in their responsive memorandum

4    that IAI's and IAP's liability for unpaid royalties should be limited based on the dates of

5    their formation is unsupported by any citation to the record.  (*See* Resp. at 3-4.)  Based on

6    the forgoing, the court concludes that the second factor is also met that there is

7    insufficienct consideration running to IAI in light of the assets being sold to IAP.

8    Accordingly, the court GRANTS Plaintiffs' motion for summary judgment concluding

9    IAP is liable for IAI's breach of contract with respect to Plaintiffs as a mere continuation

10   of IAI.

11              **2.  Fraudulent Transfer**

12              Plaintiffs also assert that the court should disregard the corporate distinction

13   between IAP and IAI and hold the Thompsons personally liable for IAI's and IAP's

14   breach of contract based on a fraudulent transfer of assets from IAI to IAP.  (Mot. at 13-

15   15.)  A court will pierce the corporate veil and find a corporate entity is one and the same

16   with another corporate entity when the corporate form has been intentionally used to

17   violate or evade a duty.  *Rapid Settlements, Ltd. v. Symetra Life Ins. Co.*, 271 P.3d 925,

18   930 (Wash. Ct. App. 2012).  In addition, the corporate separateness that shields an owner

19   from liability may be disregarded under certain circumstances.  *Id.*  In order to disregard

20   the corporate form based on a fraudulent transfer of assets, the court evaluates two

21   factors:  (1) the corporate form must be "used to violate or evade a duty," and (2)

22   disregard of the corporate form must be "necessary and required to prevent unjustified

1    loss to the injured party." *Meisel v. M & N Modern Hydraulic Press Co.*, 645 P.2d 689,

2    692 (Wash. 1982).  "With regard to the first element, the court must find an abuse of the

3    corporate form."  *Id.*  "Such abuse typically involves fraud, misrepresentation, or some

4    form of manipulation of the corporation to the stockholder's benefit and creditor's

5    detriment."  *Id.* (internal quotations omitted).  "With regard to the second element,

6    wrongful corporate activities must actually harm the party seeking relief so that disregard

7    is necessary."  *Id.* at 693.  The court will address each element in turn.[3]

8        First, the court considers whether it should pierce the corporate veil or disregard

9    the corporate distinction between IAI and IAP on this additional ground.  Plaintiffs have

10   offered substantial evidence with respect to the first element.  On February 16, 2011,

11   TWP America, Inc., moved for default judgment against IAI in the Supreme Court of the

12   State of New York.  (Kruckeberg Decl. Ex. C at 12.)  On February 18, 2011, Mr.

13   Thompson created IAP.  (Thompson Decl. ¶ 9.)  On February 21, 2011, by signing the

14   Agreement of Understanding on behalf of both IAI and IAP, Mr. Thompson transferred

15   all of IAI's assets to IAP.  (*See generally* Kruckeberg Decl. Ex. A.)  On July 13, 2011,

16

17       [3] RCW 25.15.060 provides in part:

18
19       Members of a limited liability company shall be personally liable for any
         act, debt, obligation, or liability of the limited liability company to the
20       extent that shareholders of a Washington business corporation would be
         liable in analogous circumstances.  In this regard, the court may consider
21       the factors and policies set forth in established case law with regard to
         piercing the corporate veil . . . .

22   (*Id.*)  Accordingly, Washington case law with respect to piercing the corporate veil applies
     equally to both IAI, which is a corporation, and IAP, which is a limited liability company.

1   the Supreme Court of the State of New York entered a judgment against IAI and in favor

2   of TWP America, Inc. in an amount of $50,370.36.  In addition, Mr. Thompson has

3   indicated in email correspondence with Mr. Curtis that IAI is indebted to Bank of

4   America in a similar amount.  (*See* Curtis Decl. Ex. B at 9 ("[IAI] has one judgment with

5   TWP and another in the works with B of A.  Together these total over $100K.").)

6          After reciting that IAI has incurred debts in excess of $1.7 million, the Agreement

7   of Understanding states that IAP was "formed . . . with the express intention of

8   continuing to maintain the IAI line of books as a viable business. . . ."  (Kruckeberg Decl.

9   Ex. A at 7.)  The Agreement also states that "[a]ny new agreement regarding the sale of

10  IAI assets must include a provision that net amounts which [Mr. Thompson] or [Ms.

11  Thompson] loan to IAP following the date [of the agreement] . . . shall be repaid as a

12  priority item following . . . [certain] royalty payments . . . ."  (*Id.* at 7-8.)

13         In email correspondence with Mr. Chara dated August 26, 2011, Mr. Thompson

14  admitted that IAI "transferred its operating assets (inventory and accounts receivable) to a

15  newly formed company [IAP] . . . in order to (hopefully) hold off Bank of America and

16  TWP long enough to find a suitable buyer that can keep the IAI collection moving

17  forward."  (Curtis Decl. Ex. A at 6.)  Again, on October 12, 2011, in further email

18  correspondence with Mr. Curtis, Mr. Thompson stated:

19       As I told you a while back, [IAI] has one judgment with TWP and another
         in the works with B of A.  Together these total over $100K.  To avoid a
20       liquidation which would result in no one but the secured creditors getting
         anything, the inventories and operating assets, including the inventory,
21       were transferred to another company [IAP] last Feb in hopes we can secure
         a way to sell the company as an ongoing operation.

22

ORDER- 15

1   (*Id.* Ex. B at 9.)

2          Abuse of the corporate form may include:  (1) the diversion of assets from one

3   corporation to another entity; and (2) the manipulation of assets and liabilities between

4   entities so as to concentrate the assets in one and the liabilities in another.  *See* Thomas

5   V. Harris, Washington's Doctrine of Corporate Disregard, 56 Wash. L. Rev. 253, 260 n.

6   38 (1980); *Meisel*, 645 P.2d at 692 (citing Harris article above).  Here, the record detailed

7   above supports the conclusion that Mr. Thompson diverted assets owned by IAI to IAP

8   leaving IAI unable to pay debts to its creditors.  IAI owes a duty to its creditors to pay its

9   debts, and it has been rendered incapable of doing so by the transfer of all of its assets

10  and accounts receivable to IAP.

11          In addition, with respect to the second element, disregard of the corporate

12  distinction between IAI and IAP is necessary to prevent unjustified losses to Plaintiffs.

13  Defendants admit they failed to deliver royalties due for quarters ending September 30,

14  2009 through June 30, 2012.  (Kruckeberg Decl. Ex. H at 89.)  Nevertheless, Defendants

15  assert that IAP, the entity to which Mr. Thompson transferred all of IAI's assets, is "only

16  liable for royalties due between February 18, 2011 (its date of formation) and the

17  present," whereas IAI would be liable for unpaid royalties due prior to that date.  (*See*

18  Resp. at 3-4.)  Defendants' position would effectively render Plaintiffs incapable of

19  collecting any unpaid royalties due prior to February 18, 2011 due to the transfer of all of

20  IAI's assets to IAP.

21          Defendants offer scant evidence in contravention of the forgoing facts.  In his

22  declaration, Mr. Thompson offers conclusory statements in an attempt to raise an issue of

ORDER- 16

1   fact.  He states that "[n]either IAI nor IAP has been used for an improper purpose, nor

2   have the corporate forms been abused."  (Thompson Decl. ¶ 10.)  He also states that he

3   has "observed all corporate legal requirements in running the business."  (*Id.* ¶ 17.)

4   Neither of these statements creates a genuine issue of material fact with respect to the

5   abuse of IAI's and IAP's corporate forms.

6          "Conclusory allegations unsupported by factual data will not create a triable issue

7   of fact" allowing a party to survive a summary judgment motion.  *Marks v. United States*,

8   578 F.2d 261, 263 (9th Cir. 1978). "The mere existence of a scintilla of evidence in

9   support of the plaintiff's position will be insufficient."  *Anderson*, 477 U.S. at 252.  As the

10  Ninth Circuit has stated:

11          Self-serving affidavits may be cognizable on motions for summary
             judgment if they go beyond conclusions and include facts that would be
12          admissible in evidence, *see United States v. Shumway*, 199 F.3d 1093,
             1103-04 (9th Cir. 1999), but "a conclusory, self-serving affidavit, lacking
13          detailed facts and any supporting evidence, is insufficient to create a
             genuine issue of material fact," *FTC v. Publ'g Clearing House, Inc*., 104
14          F.3d 1168, 1171 (9th Cir. 1997); *see also Rodriguez v. Airborne Express*,
             265 F.3d 890, 902 (9th Cir. 2001) (summary judgment inappropriate where
15          plaintiff set forth facts directly relevant to claim with "great specificity");
             *McLaughlin*, 849 F.2d at 1206 (nonmoving party survived summary
16          judgment where he relied on sworn affidavit that included specific factual
             averments, sworn answers to interrogatories, and payroll documentation
17          supporting his factual allegations).

18  *Burchett v. Bromps*, 466 Fed. App'x 605, 606-07 (9th Cir. 2012) (unpublished).  Here,

19  Mr. Thompson merely states in a conclusory fashion that neither IAI nor IAP have been

20  used for an improper purpose and that their corporate forms have not been abused.

21  (Thompson Decl. ¶¶ 10, 17.)  He does not bolster these conclusions with any supporting

22  facts and does not deny any of the specific facts stated above.  Thus, he cannot survive

ORDER- 17

1   summary judgment on this issue.  Accordingly, the court rules on summary judgment that

2   the corporate veil between IAI and IAP has been pierced and both entities will be subject

3   to the same liability with respect to Plaintiffs' claims.

4        The court, however, declines to pierce the corporate veil with respect to Mr.

5   Thompson's and Ms. Thompson's personal liability on summary judgment.  Mr.

6   Thompson has testified that neither his nor Ms. Thompson's bank accounts were ever

7   comingled with IAI's or IAP's bank accounts.  (Thompson Decl. ¶ 16.)  Although

8   undisputed evidence establishes that Mr. Thompson transferred the assets of IAI to IAP

9   to avoid a duty to IAI's creditors, there is no evidence presently before the court that

10  either of the Thompsons personally dissipated any of IAI's or IAP's assets.  Instead, the

11  evidence before the court is that the Thompsons pay for IAP expenses when IAI's

12  proceeds do not cover operating costs either through personal investments in or loans to

13  the companies.  (*See* Kruckeberg Decl. Ex. A at 7 ("It is anticipated that [the Thompsons]

14  will provide funds in order to pay IAP expenses and obligations when net proceeds from

15  selling IAI books are not sufficient . . . ."); Thompson Decl. ¶ 13 ("To cover the costs of

16  keeping both [IAI and IAP] viable, [Ms. Thompson] has loaned some of her personal

17  funds and I [Mr. Thompson] have invested my own money.").)

18       Plaintiffs also assert that the Thompsons "conduct the business as their personal

19  enterprise . . . [because they] liv[e] in 'the fourth bedroom of the business office' instead

20  of receiving compensation from the business."  (Mot. at 14 (quoting Kruckeberg Decl.

21  Ex. A).)  They also point to the provision in the Agreement of Understanding that

22  requires any purchaser of IAI's assets to pay off any loans the Thompsons make to IAP

1   offset by any amount IAP has paid for the Thompsons' personal expenses.  (*Id.*)  Yet,

2   because IAI's assets have not been sold yet, there is no evidence that any of the foregoing

3   activities have actually harmed Plaintiffs.  Without such evidence, the court cannot

4   conclude that Plaintiffs have established the second element necessary for disregarding

5   IAI's and IAP's corporate form and finding the Thompsons personally liable.

6   Accordingly, the court denies this aspect of Plaintiffs' motion for summary judgment,

7   and the issue of the Thompsons' personally liability remains for trial.

8   **D.  Willful Copyright Infringement**

9          Plaintiffs also move for summary judgment that Defendants infringed Plaintiffs'

10  copyright of the Books, the infringement was willful, and the Thompsons are both

11  directly liable for the infringement and secondarily liable for IAI's and IAP's

12  infringement.  (Mot. at 15-19.)  As discussed below, because the court finds that the

13  Thompsons have admitted to directly infringing Plaintiffs' copyrights, there is no need

14  for the court to reach the issue of the Thompsons' secondary liability.  The court will

15  address the issues of infringement and willfulness in turn.

16         To establish a prima facie case of copyright infringement, Plaintiffs must

17  demonstrate (1) ownership of a valid copyright, and (2) copying of constituent elements

18  of the work that are original.  *Wash. Show Co. v. A-Z Sporting Goods, Inc.*, 704 F.3d 668,

19  674 (9th Cir. 2012).  While a copyright owner may license its exclusive rights to another

20  person, the licensee infringes the owner's copyright when the licensee reproduces,

21  distributes, or displays the work after the copyright owner has terminated the licensee's

22  license.  *See generally Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir. 1993) ("After

1  the agreement is terminated, any further distribution would constitute copyright

2  infringement."); *Carson v. Verismart Software*, No. C 11-03766 LB, 2012 WL 1038662,

3  at *4 (N.D. Cal. Mar. 27, 2012).  In addition, the licensee may be liable for copyright

4  infringement if the licensee exceeds the scope of the license.  *Effects Assocs., Inc. v.*

5  *Cohen*, 908 F.2d 555, 558 n. 5 (9th Cir. 1990) (explaining that a party may be liable for

6  copyright infringement when the use of the copyrighted materials exceeded the scope of

7  the implied license (citing *Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984))).

8       Here, Defendants admit that Plaintiffs own valid copyrights in the Books.[4]

9  (Kruckeberg Decl. Ex. H at 90 (RFA No. 31).)  Defendants admit that Plaintiffs

10  terminated the publishing contracts, and therefore any license to reproduce, distribute or

11  display the Books.[5]  (*Id.* at 92 (RFA No. 40).)  Defendants admit that they reproduced,

12  distributed and displayed the Books after Plaintiffs terminated the publishing agreements

13  and Defendants' license to do so.[6]  (*Id.* at 92-93 (RFA Nos. 41-43).)

14

15

16  [4] "**REQUEST FOR ADMISSION NO. 31:**  Admit that Plaintiffs are the owners of copyrights in the Books.  **ANSWER:**  Admit."  (Kruckeberg Decl. Ex. H at 90.)

17
18  [5] "**REQUEST FOR ADMISSION NO. 41:**  Admit that you made copies of the Books, including images from the Books, in whole or in part after the Authors terminated the Publishing Agreements.  **ANSWER:**  Admit."  (Kruckeberg Decl. Ex. H at 92.)

19
20  [6] "**REQUEST FOR ADMISSION NO. 41:**  Admit that you made copies of the Books, including images from the Books, in whole or in part after the Authors [Plaintiffs] terminated the Publishing Agreements.  **ANSWER:**  Admit.

21
22  **REQUEST FOR ADMISSION NO. 42:**  Admit that you distributed the Books or copies of the Books, including images from the Books or copies of images from the Books, in whole or in part after the Authors [Plaintiffs] terminated the Publishing Agreements.  **ANSWER:**  Admit.

1    In their discovery requests, Plaintiffs specify that "'You' means IAI, IAP, J.

2  Thompson, and K. Thompson who, collectively formerly published the Books, as well as

3  their members, agents, servants, attorneys, analysts, employees, former employees,

4  predecessors and successors in interest, other representatives, and others who are in

5  possession of, or may have obtained information for or on behalf of, any of the

6  aforementioned persons."  (Kruckeberg Decl. Ex. H at 61.)  Defendants did not object to

7  this definition, or otherwise limit their responses to Plaintiffs' requests for admission to a

8  smaller subset of Defendants.  Accordingly, all Defendants (IAI, IAP, Mr. Thompson,

9  and Ms. Thompson) have admitted to the foregoing facts.  Defendants' admitted acts

10  infringed upon Plaintiffs' exclusive rights to control their work.  Accordingly, the court

11  grants this aspect of Plaintiffs' motion for summary judgment and holds that Defendants

12  IAI, IAP, Mr. Thompson, and Ms. Thompson are each directly liable for copyright

13  infringement of the Books.[7]

14

---

15    **REQUEST FOR ADMISSION NO. 43:**  Admit that you displayed the Books or copies

16  of the Books, including images from the Books or copies of images from the Books, in whole or
   in part after the Authors [Plaintiffs] terminated the Publishing Agreements."  **ANSWER:**
   Admit."  (Kruckeberg Decl. Ex. H at 92-93.)

17

18  [7] As discussed above, the Thompsons have admitted that they are directly liable for
   infringement of Plaintiffs' copyrights.  (*See* Kruckeberg Decl. Ex. H (Defendants' responses to
   RFAs) at 90, 92-93; *see id.* at 61 (defining term "you" to include IAI, IAP, Mr. Thompson, and
19  Ms. Thompson).)  Plaintiffs, however, also assert that the Thompsons are secondarily liable for
   IAI's and/or IAP's infringement (Mot. at 18-19), and that the Thompson's have failed to provide
20  any response with respect to this issue of their secondary liability (Reply (Dkt. # 27) at 2).  A
   defendant is secondarily liable for copyright infringement when the defendant exercises
21  "requisite control" over the direct infringer and derives a financial benefit from the direct
   infringement.  *Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1155 (9th Cir.
22  2007).  A defendant "exercises control over a direct infringer when he has both a legal right to
   stop or limit the directly infringing conduct, as well as the practical ability to do so."  *Id.*

ORDER- 21

1       Plaintiffs also assert that Defendants' infringement was willful.  The Copyright

2 Act provides an additional damage remedy if a plaintiff can show that infringement of his

3 or her rights was willful.  *Wash. Shoe*, 704 F.3d at 674 (citing 17 U.S.C. § 504(c)(2)).

4 The court may find "willfulness" based on either intentional behavior or reckless

5 behavior of the infringer.  *Id.* (citing *Barboza v. New Form, Inc.*, 545 F.3d 702, 707 (9th

6 Cir. 2008)).  To prove willfulness, a plaintiff must show (1) that the defendant was

7 actually aware of the infringing activity, or (2) that the defendant's actions were the result

8 of reckless disregard for, or willful blindness to, the copyright holders' rights.  *Id.*

9 Evidence that the infringer has been given notice of the infringement "is perhaps the most

10 persuasive evidence of willfulness."  *Id.* (quoting *Chi-Boy Music v. Charlie Club, Inc.*,

11 930 F.2d 1224, 1227 (7th Cir. 1991).  In this case the evidence, as described above, is

12 overwhelming that Defendants knew of their infringement.  As discussed above,

13 Plaintiffs provided unequivocal notice that the continued reproduction, distribution, and

14 display of the Books would constitute infringement.  Despite this notice, Defendants

15 continued to infringe Plaintiffs' copyrights in the Books.

16       Further, in their responsive memorandum and in Mr. Thompson's declaration,

17 Defendants neither cite to nor offer any evidence in contravention to Plaintiffs' assertion

18

19

20 Although Plaintiffs assert that they are entitled to summary judgment on this issue because Defendants failed to respond, Plaintiffs provided scant evidence with respect to the financial benefit the Thompsons' personally derived from any infringement, and scant evidence of Ms. Thompson's legal right to stop or limit the infringement or her practical ability to do so. Nevertheless, because the Thompson's have admitted to direct infringement of Plaintiff's copyrights, it is unnecessary for the court to rule on this issue, and it therefore declines to do so.

21

22

1    of willfulness.  (*See generally* Resp.; Thompson Decl.)  Instead, Defendants offer a near

2    specious argument that Seventh Amendment to the United States Constitution, providing

3    for the right to a jury trial, prohibits any summary adjudication of the issue of willfulness

4    and statutory damages under the Copyright Act, 17 U.S.C. § 504(c).  (Resp. at 6-7.)  This

5    assertion is patently wrong.  "It is established law that the Seventh Amendment right to a

6    trial by jury does not preclude the granting of a summary judgment where there is no

7    genuine issue of material fact."  *Diamond Door Co. v. Lane-Stanton Lumber Co.*, 505

8    F.2d 1199, 1203 (9th Cir. 1974); *see also In re Healthcentral.com*, 504 F.3d 775, 787

9    (9th Cir. 2007) (reasoning that court's ruling on dispositive motions does not affect a

10   party's Seventh Amendment right to a jury trial as these motions merely address whether

11   trial is necessary at all).[8]  Accordingly, the court grants Plaintiffs' motion for summary

12   judgment that Defendants' infringement of Plaintiffs' copyrights of the Books was

13   willful.

14   **E.  Permanent Injunction**

15        Plaintiffs also seek the imposition of a permanent injunction against Defendants

16   prohibiting any further violation of Plaintiffs' copyrights in the Books.  The Copyright

17   Act provides that a court may "grant temporary and final injunctions on such terms as it

18   may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C.

19   ─────────────────

20        [8] Defendants' reliance on *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340,
     344 (1998) is misplaced.  The issue in *Feltner* was whether a bench trial satisfies one's right to a

21   jury trial.  *Id.* at 345.  The Supreme Court held that it does not.  *Id.* at 355.  The entire analysis of
     the case revolves around the distinction between courts sitting in equity and courts of law.  *Id.*

22   352-53.  *Feltner* says nothing about a trial court's authority to resolve undisputed legal issues on
     summary judgment.

ORDER- 23

1  § 502(a).  "The Copyright Act provides the owner of a copyright with a potent arsenal of

2  remedies against an infringer of his work, including an injunction to restrain the infringer

3  from violating his rights . . . ."  *Sony Corp. of Am. v. Universal City Studios*, 464 U.S.

4  417, 433-34 (1984).  When liability for copyright infringement has been established, a

5  permanent injunction will be granted if there is a threat of continuing violations.  *MAI*

6  *Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993).

7      Plaintiffs assert that a permanent injunction is necessary because Defendants

8  continued to infringe Plaintiffs' copyrights in the Books well after Plaintiffs demanded

9  that the infringement stop.  In addition, Defendants are still in possession of copies of the

10  Books and the means of producing them, which increases the risk of a continuing

11  violation.  Defendants offer no opposition to the imposition of a permanent injunction on

12  summary judgment.  (*See generally* Resp.; *see also* Reply at 4.)  Accordingly, the court

13  will grant this portion of Plaintiffs' motion, permanently enjoin Defendants from

14  infringing Plaintiffs' copyrights in the Books, and order Defendants to return to Plaintiffs

15  all infringing copies of the Books and all means, electronic or otherwise, of reproducing

16  the Books.

17              **IV.    CONCLUSION**

18      Based on the foregoing, the court GRANTS in part and DENIES in part Plaintiffs'

19  motion for partial summary judgment (Dkt. # 22).  Because the court has determined on

20  summary judgment that Defendants are liable for willful copyright infringement, the

21  court also hereby permanently ENJOINS Defendants from continued infringement of

22  Plaintiffs' copyrights in the Books, and ORDERS Defendants to return to Plaintiffs all

1    infringing copies of the Books and all means, including electronic means, of reproducing

2    the Books within ten days of the date of this order.

3        Dated this 29th day of May, 2013.

4

5    _____
     JAMES L. ROBART
6    United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 25